UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:22-cv-20110-JEM/Becerra

NOEL RICARDO STEPHENS,

      Petitioner,

v.

GARRETT RIPA, *et al.*,

      Respondents.

_____/

## REPORT AND RECOMMENDATION ON
## PETITION FOR WRIT OF HABEAS CORPUS[1]

**THIS CAUSE** came before the Court upon Petitioner Noel Ricardo Stephens' ("Petitioner") Amended Petition for Writ of Habeas Corpus.  ECF No. [3].  Respondents Garret J. Ripa ("Ripa"), Tae D. Johnson ("Johnson"), Alejandro Mayorkas ('Mayorkas"), and Merrick B. Garland ("Garland") (collectively "Respondents") filed a Response in Opposition to the Petition (the "Response").  ECF No. [15].  Petitioner subsequently filed a Traverse (the "Reply").  ECF No. [17].  On February 7, 2022, the Parties appeared for oral argument on this matter.  ECF No. [18].  Upon due consideration of the Petition, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that the Petition for Writ of Habeas Corpus, ECF No. [3], be **GRANTED IN PART AND DENIED IN PART**.

---

[1] This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States District Judge.  ECF No. [9].

## I.    BACKGROUND

Petitioner is a Jamaican national who was admitted into the United States on a tourist visa on August 17, 1999.  ECF No. [3] ¶ 24.  In May 2004, Petitioner adjusted his status to that of a lawful permanent resident.  *Id.* ¶ 25; ECF No. [3-1].  On September 2, 2010, Petitioner was convicted of two counts of "Possession of Marijuana for Sale" by the Arizona Superior Court.  *See* ECF No. [15-2] at 5.  Additionally, on June 24, 2011, Petitioner was convicted of Conspiracy to Possess with Intent to Distribute Marijuana and Possession of a Firearm in Furtherance of a Drug Trafficking Crime by the United States District Court for the Western District of New York.  *Id.* at 5–6.  Ultimately, Petitioner was sentenced to 120 months of imprisonment.  ECF No. [15] at 2.

In June 2013, while Petitioner was serving his criminal sentence, the Department of Homeland Security ("DHS") initiated removal proceedings against him by issuing a Notice to Appear ("NTA").  ECF No. [3] ¶ 27.  Petitioner appeared *pro se* for two hearings before an immigration judge before the judge "administratively closed [his] case until he was closer to completing his [criminal] sentence."  *Id.* ¶¶ 27–29.  In July 2019, Petitioner's immigration case was re-opened, and he was ultimately transferred into immigration custody after he completed his sentence.  *Id.* ¶ 30.

On August 28, 2019, while in immigration custody, Petitioner filed an application for asylum pursuant to the Convention Against Torture ("CAT") based on his fear that he would face torture in Jamaica due to his work as a criminal informant for the United States Immigration and Customs Enforcement ("ICE"), and because bisexual males face a high likelihood of torture in Jamaica.  *Id.* ¶¶ 33–34.  Specifically, Petitioner alleged that "he

would likely be tortured by security forces in Jamaica as retribution for the information he provided as an ICE informant against their family or close friends."  ECF No. [3-17] at 10. In addition, Petitioner alleged that "he is bisexual, and that he has had numerous boyfriends, including his current boyfriend, Leyton Ramsay, a transgender female."  *Id.* at 6.  Leyton Ramsay ("Ramsay") submitted a letter in support of Petitioner's CAT claim, "stating that she and [Petitioner] had a physical relationship while in prison [and that] they could not have a sexual relationship because BOP policies prohibited it.  She maintained that the entire compound knew they were together and that it was upsetting to many other Jamaicans in the facility.  *Id*. (quotations and citations omitted).  Ramsay further stated that "these inmates threatened to beat up [Petitioner], and they threatened to kill her and [Petitioner] on spot if they were ever seen in Jamaica.  She also indicated that two Jamaican inmates that [Petitioner] knew told him that they called family/mutual friends in New York and Jamaica to tell them that [Petitioner] was in prison having sex with another man."  *Id*. (quotations and citations omitted).  Moreover, Ramsay stated that "everyone [in Jamaica] is talking about [Petitioner] and the area leaders are saying he cannot come back to Jamaica because he was sleeping with a man in prison." *Id*. at 6–7 (quotations and citations omitted) (first alteration supplied).

On December 23, 2019, an immigration judge denied Petitioner's asylum application and ordered him removed from the United States.  ECF No. [3] ¶ 35. Subsequently, Petitioner filed a *pro se* appeal of the immigration judge's asylum determination with the Board of Immigration Appeals (the "BIA").  *Id.* ¶ 36.  The BIA dismissed Petitioner's appeal because: (1) he "failed to demonstrate that he was more likely

than not to be subject to torture in Jamaica because of his informant status" and (2) "failed to demonstrate that he more likely than not would be tortured because of his sexual orientation if removed to Jamaica, or that any such torture would be by or with the consent of the Jamaican government."  ECF No. [3-17] at 7, 10.

Thus, Petitioner filed a *pro se* appeal of the BIA's dismissal with the Third Circuit Court of Appeals in July 2020.  ECF No. [3] ¶ 38.  On March 9, 2021, the Third Circuit issued its opinion affirming in part and reversing in part.  *See* ECF No. [3-17].  Specifically, the Third Circuit affirmed the immigration judge's "denial of [Petitioner's] CAT claim based on his status as an ICE informant" because "objective evidence in the record did not support [the] claim that security forces targeted confidential informants . . . [a]nd substantial evidence support[ed] the conclusion that [Petitioner] failed to provide evidence" that any of the persons he informed upon "will target him because of his role as a confidential informant."  *Id.* at 10.

However, the Third Circuit reversed the BIA's denial of Petitioner's CAT claim based on his sexual orientation.  *Id.* at 6.  Specifically, the Third Circuit concluded that the immigration judge erred in affording "little weight to Ramsay's letter, which detailed both specific death threats by Jamaicans against Stephens because of his bisexuality and Ramsey's account of witnessing police turn a blind eye toward the abuse of LGBTQ individuals."  *Id.* at 7 (quotations and citations omitted).  The Third Circuit explained that:

> [b]ecause neither of the [immigration judge]'s bases for determining that Ramsey's letter was inconsistent with [Petitioner's] testimony is adequately supported by the record, the Agency erred in discounting it.  And because it is unclear how the Agency might have weighed the letter in determining

whether Stephens had met his burden of proof on the CAT claim, the error is
not harmless.

*Id.* at 9–10.  Thus, the Third Circuit remanded the case back to the BIA so that it could re-evaluate Petitioner's CAT claim based on his sexual orientation.  *Id.*  at 9.

On October 5, 2021, Petitioner, with the help of a *pro bono* immigration attorney, filed a Brief Following Federal Court Remand with the BIA.  *See* ECF No. [3-18].  Therein, Petitioner requested, among other things, a new hearing on the merits.  *See id*.  However, since the Third Circuit issued its opinion in March 2021, the BIA has not taken any action in Petitioner's case.  *See* ECF No. [3] ¶ 42.

In the interim, on January 4, 2021, an immigration judge conducted a bond hearing, at which Petitioner appeared *pro se*.  ECF No. [15-2] at 2.  The immigration judge noted that, at the time, Petitioner's appeal with the Third Circuit remained pending and that the Third Circuit had issued a stay of removal proceedings.  *Id.* at 6.  Notwithstanding, the immigration judge assessed whether Petitioner was eligible for a bond by considering whether the Government had established by clear and convincing evidence that Petitioner posed a danger to the community and a significant flight risk.  *Id.* at 6–7.  Ultimately, the immigration judge determined that the Government had met its burden and that Petitioner was properly detained without a bond.  *Id.* at 8.  Petitioner appealed the immigration judge's bond determination to the BIA.  *Id.* at 4.  The BIA ultimately dismissed the appeal, concluding that "the record supports [the immigration judge's] conclusion that the DHS met its burden to establish by clear and convincing evidence that [Petitioner] should be

detained without bond because he presents a danger to the community and a flight risk. *Id.* at 3 (citations omitted).

On January 9, 2022, Petitioner filed the instant Petition for Writ of Habeas Corpus, asserting one count for unlawful detention in violation of the Fifth Amendment. ECF No. [3] at 24–25. Petitioner requests that this Court assume jurisdiction over this matter. *Id.* at 26. Additionally, Petitioner requests immediate release from immigration custody, or in the alternative, a bond hearing with the burden of proof to be placed on the Government. *Id.* Furthermore, Petitioner requests attorneys' fees and costs under the Equal Access to Justice Act. *Id.*

In their Response, Respondents first argue that Petitioner is not entitled to release or a bond hearing because the Supreme Court has definitively affirmed the constitutionality of mandatory detention pending removal. ECF No. [15] at 6–8. Second, Respondents argue that the Court lacks jurisdiction over this matter because Petitioner failed to exhaust his administrative remedies by failing to request a bond redetermination. *Id.* at 8–9. Third, Respondents argue that Petitioner has already received a bond hearing and an additional hearing is not warranted because when "considering the case as a whole, Petitioner's detention does not constitute a due process violation." *Id.* at 9–12. Finally, Respondents argue that if the Court concludes that Petitioner's detention exceeds Constitutional limits, the bond hearing should take place before an immigration judge where the burden of proof should be placed on Petitioner. *Id.* at 13–18.

In his Reply, Petitioner re-asserts that "[t]he Supreme Court has never approved a wholesale justification of detention for every individual subject to mandatory detention by

[Section 1226(c)]."  ECF No. [17] at 2–3.  Instead, Petitioner argues that a reasonableness inquiry should guide the determination of whether pre-removal detention has become unconstitutionally prolonged.  *Id.* at 3–9.  Next, Petitioner argues that a challenge to the lawfulness of pre-removal detention is not subject to an administrative exhaustion requirement, but even if it was, the bond hearing in this case is a legal nullity because the immigration judge did not have authority to conduct the hearing.  *Id.* at 10–12.  Moreover, Petitioner submits that the bond hearing conducted by the immigration judge did not comport with due process requirements because it did not afford Petitioner a meaningful opportunity to challenge his detention.  *Id.* at 12–16.  Finally, although Petitioner maintains that the Court should grant supervised release pursuant to its habeas authority, the Court should alternatively conduct a bond hearing itself with the burden to be placed on the Government.  *Id.* at 16–20.

On February 7, 2022, the undersigned held oral argument on this matter.  ECF No. [18].  At the hearing, Respondents maintained that a detention hearing was unnecessary because Petitioner already received a detention hearing where the immigration judge determined that he was a danger to the community and a flight risk.  Respondents argued that an additional detention hearing would be futile because Petitioner could not present any new evidence that would alter the bond determination made by the immigration judge. In response to the Court's questions regarding the expected length of continued detention, Respondents noted that upon remand, the BIA could take up to one year to issue an opinion. Respondents clarified that the BIA typically proceeds by either remanding to the immigration judge for further factual findings, by setting for hearing, or by issuing a new

decision.  However, Respondents noted that they had no additional insight as to when the BIA was expected to issue any new orders in Petitioner's case.

## II.   ANALYSIS

The instant matter concerns whether Plaintiff's pre-removal detention has become unreasonably prolonged.  Under the Immigration and Nationality Act (the "INA"), "'[t]he Attorney General shall take into custody any alien who' is removable from this country because he has been convicted of one of a specified set of crimes."  *Demore v. Kim*, 538 U.S. 510, 513 (2003) (alteration supplied) (quoting 8 U.S.C. § 1226(c)).  As set forth above, in June 2011, Petitioner was convicted of two federal offenses and sentenced to a term of imprisonment of 120 months.  *See* ECF No. [3-2].  On July 15, 2019, upon completing his criminal sentence, Petitioner was transferred to Respondents' custody and subjected to mandatory pre-removal detention pursuant to Section 1226(c).  *See* ECF No. [3-7].

### A.  The Court Has Subject Matter Jurisdiction Over The Instant Petition.

Although Respondents have argued in other cases that the INA divests district courts of jurisdiction to review constitutional challenges to the length of pre-removal detention, they have not made that argument in this case.  *See Rogers v. Ripa*, No. 1:21-cv-24433-JLK (S.D. Fla. Jan. 22, 2022), ECF No. [24].  Accordingly, the only jurisdictional challenge to the instant Petition is that the Court does not have subject matter jurisdiction because Petitioner has failed to exhaust his administrative remedies.

The INA imposes certain administrative exhaustion requirements before a district court has jurisdiction to review an immigration order.  *See* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative

remedies available to the alien as of right . . . .”); *Gutierrez-Castro v. U.S. Attorney Gen.*, 832 Fed. Appx. 677 (11th Cir. 2020) (“If a petitioner has failed to exhaust her administrative remedies by not raising an issue before the BIA, we lack jurisdiction to consider the claim.”) (citing *Amaya-Artunduaga v. U.S. Att’y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006)); *Bing Quan Lin v. U.S. Attorney Gen.*, 881 F.3d 860, 868 (11th Cir. 2018) (“Where a procedural due process claim properly falls within the immigration courts’ power to review and provide a remedy, the claim must be exhausted before it can be considered by this Court.”).  Specifically, “[t]he petitioner must have previously argued the core issue now on appeal.  Further, where the BIA has the power to review a claim and provide a remedy, exhaustion of that claim is required before we can consider it.” *Taweesuk v. U.S. Attorney Gen.*, 809 Fed. Appx. 762, 763 (11th Cir. 2020) (citations and quotations omitted).

Respondents maintain that criminal aliens subject to mandatory pre-removal detention under Section 1226(c) are *never* entitled to a detention hearing.  This case, however, presents an unusual scenario because the Petitioner *did* have a bond hearing on January 4, 2021.  Respondent initially argued in their Response that Petitioner appeared for that bond hearing before an immigration judge, as required by the Third Circuit’s decision in *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208 (3d Cir. 2018). *See* ECF No. [15] at 3.  However, at the hearing before the undersigned, Respondents withdrew the claim that *Guerrero-Sanchez* requires an immigration judge to conduct a bond hearing.  Indeed, there is nothing in *Guerrero-Sanchez* that can be interpreted to support the Government’s initial position that Petitioner was given a hearing pursuant to

any directive that can be discerned from *Guerrero-Sanchez*.  Upon the Court's suggestion that the January 4, 2021 hearing was perhaps conducted in error, Respondents clarified their position that a bond hearing should have never occurred, and that the immigration judge *may* have conducted the hearing to ensure a "high level of safety" and to comport with due process requirements.  This assertion bolsters Petitioner's argument that the bond hearing was a legal nullity because the immigration judge afforded Petitioner a hearing that Respondents argue he was not entitled to receive.

Respondents' argument now is that because Petitioner received a bond hearing, albeit one that he was not entitled to receive, he must now exhaust all administrative remedies.  Specifically, Respondents argues that although Petitioner appealed the immigration judge's bond determination to the BIA, this does not constitute exhaustion because he must also seek bond redetermination before the instant Petition can be heard.  This position is untenable because Respondents are insisting that Petitioner exhaust an administrative remedy that they also argue he is not entitled to receive.  Respondents cannot have it both ways.

Even if accepted as an alternative argument, it is far from clear *how* Petitioner could ever pursue the exhaustion requirement that Respondents insist upon.  Indeed, the January 4, 2021 hearing was conducted before an immigration judge in York, Pennsylvania.  *See* ECF No. [15-2] at 5.  Because Petitioner is currently detained at Krome, there is no mechanism by which he could petition a Pennsylvania immigration judge for reconsideration of the previous bond determination.  This, as well as other administrative hurdles presented by Petitioner, were not addressed by Respondents either in their

Response or, at the hearing before the undersigned where they conceded that Petitioner has no way of seeking reconsideration of the Pennsylvania bond determination given the fact that he has been transferred to Krome.   Therefore, because any possible exhaustion mechanisms are inadequate or inaccessible to Petitioner, the Court is not precluded from hearing the instant matter.   Thus, Petitioner should not be required to pursue an inexistent administrative remedy.  *See Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1556 (11th Cir. 1985) ("Courts will not require exhaustion when the administrative remedy is inadequate because it does not exist . . . .").

**B.  Petitioner Is Entitled To A Pre-Removal Detention Hearing.**

The Court must next determine whether Petitioner's pre-removal detention has been unconstitutionally prolonged.  The Fifth Amendment, which applies to aliens, provides that "[n]o person shall be . . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V; *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").  Thus, aliens are entitled to due process of law in deportation proceedings.  *Demore*, 538 U.S. at 523.

In *Demore*, the Supreme Court considered whether an alien's mandatory pre-removal detention under Section 1226(c) constituted a due process violation.  *Id.* at 513–14.   The Court concluded that a six-month detention under Section 1226(c) was constitutional because "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings."  *Id.* at 558–59.  The

Court relied on the data provided by the Executive Office of Immigration Review, which reflected that Section 1226(c) detention lasted "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.* at 530. Thus, the Court explained that this brief and limited detention was constitutional because, as a practical matter, it is a necessary aspect of the deportation process. *Id.* at 523. In his concurrence, Justice Kennedy emphasized the importance of a temporal limitation on pre-removal detention, stating that if an alien's "continued detention became unreasonable or unjustified," the alien could be entitled to "an individualized determination as to his risk of flight and dangerousness." *Id.* at 532.

Here, Respondents' argument that "*Demore* compels this Court to conclude [that] Petitioner's detention is constitutional" misses the mark. *See* ECF No. [15] at 8. The Supreme Court in *Demore* was faced with an as-applied challenge to the constitutionality of an alien's pre-removal detention. Based on the limited nature of pre-removal detention in that case, the Court concluded that no due process violation resulted. However, the Supreme Court did not address the issue before this Court now, namely whether pre-removal detention in excess of one year and in the absence of a detention hearing runs afoul of the Fifth Amendment. Subsequently, in *Jennings v. Rodriguez*, the Court considered whether Section 1226 requires that aliens "be given a bond hearing every six months and that detention beyond the initial 6–month period is permitted only if the Government proves by clear and convincing evidence that further detention is justified." 138 S. Ct. 830, 839 (2018). Although the Court concluded that Section 1226 does not impose a six-month

limitation on detention, it declined to consider whether prolonged pre-removal detention becomes, at some point, unconstitutional. *Id.* at 851. Thus, *Jennings* does not stand for the proposition, as Respondents propose, that indefinite pre-removal detention is constitutional.

The Eleventh Circuit Court of Appeals' decision in *Sopo v. United States Attorney General*, 825 F.3d 1199 (11th Cir. 2016), is instructive on this point.[2] The Court in *Sopo* identified a non-exhaustive list of factors to be considered by district courts in determining whether an alien's pre-removal detention under Section 1226(c) has been unreasonably prolonged. *Id.* at 1217. Specifically, the Court enumerated the following factors: (1) "the amount of time that the criminal alien has been in detention without a bond hearing"; (2) "why the removal proceedings have become protracted"; (3) "whether it will be possible to remove the criminal alien after there is a final order of removal"; (4) "whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable"; and (5) "whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention"; (6) "the total length of the detention"; (7) "the foreseeability of proceedings concluding in the near future (or the likely duration of future detention)"; (8) "the period of the detention compared to the criminal sentence"; (9) "the promptness (or delay) of the immigration authorities or the

---

[2] Although *Sopo* was abrogated by *Jennings* to the extent it concluded that Section 1226(c) implicitly required a detention hearing, it remains persuasive authority in determining whether prolonged pre-removal detention passes constitutional muster. In sum, although *Jennings* rejected a statutory challenge to Section 1226, it did not "foreclose as-applied challenges—that is, constitutional challenges to applications of the statute." *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019).

detainee"; and (10) "the likelihood that the proceedings will culminate in a final removal order." *Id.* at 1217–18 (quotations and citations omitted).

Since *Jennings*, courts across the country have continued to employ a fact-based analysis in determining whether the prolonged nature of pre-removal detention pursuant to Section 1226 necessitates a detention hearing. *See, e.g.*, *Hamilton v. Acosta*, No. 20-21318-CV, 2020 WL 3036782, at \*3–6 (S.D. Fla. May 8, 2020), *report and recommendation adopted*, 2020 WL 3035350 (S.D. Fla. June 4, 2020) (conducting an as-applied analysis to a constitutional challenge to pre-removal detention under Section 1226); *Villaescusa-Rios v. Choate*, No. 20-CV-03187-CMA, 2021 WL 269766, at \*1 (D. Colo. Jan. 27, 2021) (analyzing whether the length of an alien's pre-removal detention was unconstitutional based on the facts and circumstances of his case); *Gonzalez v. Bonnar*, No. 18-CV-05321-JSC, 2019 WL 330906, at \*2 (N.D. Cal. Jan. 25, 2019) (noting that "the few cases that have considered detention under Section 1226(c) post-*Jennings* have concluded that the decision depends on the individual circumstances of each case").

In evaluating Petitioner's circumstances, the undersigned finds that he is entitled to a detention hearing. First, Petitioner has been in Respondents' custody for over two years, and it appears that he will not be deported in the foreseeable future. Specifically, in January 2020, Petitioner filed a *pro se* appeal of the immigration judge's order denying his asylum application. ECF No. [3] ¶ 36. After the BIA dismissed his appeal, Petitioner filed a *pro se* petition for review in the Third Circuit. *Id.* ¶¶ 37–38. In March 2021, the Third Circuit reversed the BIA's dismissal, indicating that Petitioner had a viable CAT claim based on his sexual orientation. *Id.* ¶ 41. At this juncture, the BIA has not taken *any* action on the

remand despite the fact that the Third Circuit gave the BIA specific instructions regarding the weight to be given to the evidence introduced in support of Petitioner's CAT claim.  *Id.* ¶ 43.  At the hearing on this matter, the Government explained that upon remand, the BIA may set the case for hearing, may issue a remand to an immigration judge for additional factual finding, or may issue a new decision.  However, the Government noted that the BIA's adjudication time averages up to one year.  Therefore, at this juncture, Petitioner currently faces, at best, an unknown period of pre-removal detention that has spanned almost a year since his only bond hearing, and two since his initial detention.  Given that the Third Circuit has remanded the CAT claim and that no action has been taken on the case in almost a year, the detention has now become unreasonably prolonged.  Indeed, even accepting that the bond hearing that he did receive was valid, an assumption that Petitioner challenges, the hearing was over a year ago and the circumstances have clearly changed given the Third Circuit's remand.[3]

　　　This case starkly contrasts with *Demore*, where the Supreme Court determined that six months of pre-removal detention was not unconstitutional because *at that time*

---

[3] Specifically, Petitioner argues that the January 4, 2021 hearing was a legal nullity because the immigration judge did not have any authority to conduct a bond hearing while a judicial stay was in place, as imposed by the Third Circuit.  ECF No. [17] at 11–12.  It appears that the January 2021 hearing may have been a nullity because a judicial stay of immigration proceeding requires mandatory detention and, as Respondents posit, a criminal alien subject to mandatory detention is *never* entitled to a bond hearing.  In any event, the argument is not dispositive of the issues.  Indeed, if the January 2021 hearing was a nullity, then Petitioner's pre-removal detention has spanned over two years without any meaningful due process protection.  If the January 2021 hearing was not a nullity, Petitioner has still been in custody over one year without a new bond hearing, a period that this Court and courts across the country have found to be unreasonably prolonged.

detention under Section 1226(c) lasted "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." 538 U.S. at 530. The current length of Petitioner's detention coupled with the prospective length of continued detention weighs in favor of ordering a detention hearing. *See, e.g.*, *Hamilton*, 2020 WL 3036782, at *5 (noting that a one-year period of pre-removal detention under Section 1226(c) weighs in favor of granting a detention hearing); *Liban M.J. v. Sec'y of Dep't of Homeland Sec.*, No. 18-CV-1843 (NEB/ECW), 2018 WL 8495827, at *6 (D. Minn. Dec. 10, 2018) (noting that a "12-month [pre-removal] detention is within the range courts have found sufficient to require a bond hearing under the Due Process Clause").

Moreover, there is no indication that Petitioner has delayed his pre-removal proceedings. Instead, it appears that despite proceeding *pro se* in all immigration matters, Petitioner has appropriately complied with all deadlines and requirements. In addition, there is no indication that Petitioner has pursued appellate review in bad faith or for the purpose of delay, particularly where he received a favorable decision in the Third Circuit. Thus, Petitioner's diligence in pursuing his immigration case on the merits, in filing an asylum petition, and in timely filing an appeal with the BIA and a petition for review with the Third Circuit also weighs in favor of granting a detention hearing. *See, e.g.*, *Villaescusa-Rios*, 2021 WL 269766, at *3 (noting that there were not significant delays in the removal proceedings, particularly in light of the alien's success in obtaining reversal of the immigration judge's determination on appeal).

Finally, it does not appear that Petitioner would be immediately removable if a final

order of removal is entered.  Petitioner has sought deferral of removal under the Convention Against Torture based on his sexual orientation.  ECF No. [3-9] at 2:20–4:16.  As such, Petitioner could remain detained upon the issuance of an order of removal while the Government seeks deportation to a third country where same-sex relationships are not criminalized.  *See* ECF No. [17] at 8.  Thus, because could be held indefinitely even if removal is ordered, this factor also weighs in favor of granting a detention hearing.  *See, e.g.*, *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1120 (W.D. Wash. 2019) (noting that courts may consider defenses to removal in weighing whether an alien is likely to be removed upon the entry of a final order of removal).

In sum, the Court finds that Petitioner's pre-removal detention has exceeded the brief period contemplated by the Court in *Demore*, particularly where, by Respondents' admissions, the detention will exceed the length that numerous courts have found violates the Constitution.  Under these circumstances, Petitioner's continued pre-removal detention without a hearing violates his due process rights.  As such, it is recommended that Petitioner receive a detention hearing.

## C. The Detention Hearing Should Take Place Before An Immigration Judge.

Having concluded that Petitioner is entitled to a detention hearing, the Court considers whether the hearing should take place in this Court, as Petitioner requests, or before an immigration judge, as Respondents suggest.

As previously noted, Section 1226(c) authorizes mandatory detention for an alien who is removable based on a criminal conviction.  *See* 8 U.S.C. § 1226(c).  However, Section 1226(e) provides that "[n]o court may set aside any action or decision by the

Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." *Id.* at § 1226(e). Thus, Section 1226(e) "precludes an alien from 'challeng[ing] a discretionary judgment by the Attorney General or a decision that the Attorney General has made regarding his detention or release.'" *Jennings*, 138 S. Ct. at 841 (alteration supplied) (quoting *Demore*, 538 U.S. at 516).

Instead, the Code of Federal Regulations provides that aliens can seek review of the Attorney General's detention determination by an immigration judge. *Nielsen*, 139 S. Ct. at 960 (citing 8 C.F.R. §§ 236.1(c)(8), (d)(1), 1003.19(a), 1236.1(d)); *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2281 (2021) (noting that an "alien may request a bond hearing in front of an immigration judge" in accordance with the Code of Federal Regulations) (citing 8 C.F.R. §§ 236.1(d)(1), 1003.19(a), 1236.1(d)(1)); *Sopo*, 825 F.3d at 1208 ("The District Director makes the initial custody determination, and the alien has the right to appeal an adverse decision to the IJ, and then to the BIA.") (citing 8 C.F.R § 1236.1(d)(1), (3)); *Aham v. Gartland*, No. 5:19-CV-46, 2020 WL 806929, at *3 n.3 (S.D. Ga. Jan. 29, 2020), *report and recommendation adopted*, 2020 WL 821005 (S.D. Ga. Feb. 18, 2020) ("Even where prolonged detention would warrant an individualized bond hearing, such as in the § 1226(c) context, . . . all that is required is an individualized bond hearing in accordance with 8 C.F.R. § 1236.1(c).") (citing *Sopo*, 825 F.3d at 1220).

Here, Section 1226 is clear and the Code of Federal Regulations dictates that a detention hearing must take place before an immigration judge. Accordingly, the undersigned recommends that Petitioner's detention hearing take place before an immigration judge.

18

### D.  At The Detention Hearing, The Burden Should Be On Petitioner.

The final issue before the Court is whether the burden of proof should be placed on Petitioner or on Respondents at the detention hearing.  The Code of Federal Regulations provides that a *non-criminal* alien bears the burden of proof to show that he is not a danger to the community and that he is likely to appear for future proceedings.  8 C.F.R. §§ 236.1, 1236.1; *Johnson*, 141 S.Ct. at 2280–81 ("To secure release, the alien must show that he does not pose a danger to the community and that he is likely to appear for future proceedings.") (citing 8 CFR §§ 236.1(c)(8), 1236.1(c)(8)).

Courts across the country are split on whether a *criminal* alien should bear the burden in a detention hearing.  *See Sopo*, 825 F. 3d at 1219.  Although there is no mandatory authority in this Circuit on this point, the Court finds the Eleventh Circuit's determination in *Sopo* persuasive.  In *Sopo*, the Court concluded that "[l]ike non-criminal aliens, the criminal alien carries the burden of proof and must show that he is not a flight risk or danger to others." *Id.* at 1219–20.  The Court reasoned that placing the burden on the government would give criminal aliens a benefit that non-criminal aliens do not have. *Id.*  The Court was cognizant that "by the time a criminal alien becomes eligible for a bond hearing, he has already experienced a lengthy detention.  That detention, however, occurs because Congress enacted the mandatory detention statute in § 1226(c), a statutory approach that comparatively disadvantages aliens who commit crimes over law-abiding aliens in removal proceedings." *Id.* at 1220; *J.G. v. Warden, Irwin County Det. Ctr.*, 501 F. Supp. 3d 1331, 1347 (M.D. Ga. 2020) (noting that the criminal alien has the burden of proof in a detention hearing); *J.N.C.G. v. Warden, Stewart Det. Ctr.,* No. 4:20-CV-62-MSH, 2020 WL

5046870, at *7 (M.D. Ga. Aug. 26, 2020) (ordering detention hearing for criminal alien detained under Section 1226(c) and placing burden of proof on alien to show "he is not a flight risk or danger to others"); *Khan v. Whiddon*, No. 213CV638FTM29MRM, 2016 WL 4666513, at *7 (M.D. Fla. Sept. 7, 2016) (placing the detention hearing burden of proof on the criminal alien).

Here, Petitioner initially relies on *Sopo* in arguing that he is entitled to a detention hearing but argues that the Court should not align with *Sopo* in allocating the burden of proof. To that extent, Petitioner cites out-of-circuit case law. The Court finds no reason to depart from the Eleventh Circuit's determination in *Sopo* because, as the Court noted in that case, placing the burden of proof on Respondents in the detention hearing would give Petitioner, a criminal alien, a benefit that non-criminal aliens do not enjoy. Thus, the Court aligns with other courts in this Circuit in recommending that the burden of proof be placed on Petitioner at his detention hearing before the immigration judge. Should the District Court adopt the undersigned's recommendation, it should order the detention hearing to take place within seven (7) days thereafter given the fact that Petitioner has been in immigration custody over two years.

## III.    CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that the Amended Petition for Writ of Habeas Corpus, ECF No. [3], be **GRANTED IN PART AND DENIED IN PART**. Petitioner should be entitled to a detention hearing before an immigration judge where the burden of proof should be placed on Petitioner. Should the District Court adopt the undersigned's recommendation, the bond hearing should take place within seven (7)

days from the District Court's order.  In addition, should the District Court adopt the undersigned's recommendation, Petitioner may file a request for attorneys' fees and costs within ten days and Respondents may file a response ten days thereafter.

## IV.   OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the District Court within **SEVEN (7) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on February 18, 2022.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**